**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MILDRED THOMAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 4716** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mildred Thomas seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff has now filed a motion for summary judgment. After careful review of the record, the Court denies Plaintiff's motion and affirms the decision to deny benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on December 29, 2009, alleging that she became disabled on June 14, 2009 due to sciatica, high blood pressure, diabetes, fibromyalgia, asthma, a "heart condition," arthritis and high cholesterol.

---

[1]     Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

(R. 185-88, 192-94, 222). The Social Security Administration denied the applications initially on March 19, 2010, and again upon reconsideration on August 9, 2010. (R. 47-63). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Roxanne J. Kelsey (the "ALJ") on March 2, 2011. (R. 28). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from vocational expert Glee Ann L. Kehr (the "VE"). Shortly thereafter, on April 12, 2011, the ALJ found that Plaintiff is not disabled because she can perform her past work as a phlebotomist. (R. 12-20). The Appeals Council denied Plaintiff's request for review on April 26, 2012, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for remand, Plaintiff argues that the ALJ: (1) made a flawed credibility assessment; (2) improperly ignored the effects of her non-severe impairments in determining her residual functional capacity ("RFC"); (3) erred in failing to order a pulmonary function test; and (4) violated her Due Process and Equal Protection rights under the Fifth and Fourteenth Amendments by failing to obtain a medical source statement from the consultative examiner. As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and need not be reversed or remanded.

## FACTUAL BACKGROUND

Plaintiff was born on November 26, 1949, and was 61 years old at the time of the ALJ's decision. (R. 185). She has a GED and spent 14 years working at a hospital, first as a phlebotomist and then as a phlebotomist/patient

care technician.  (R. 29, 224).  She was fired from her job on December 13, 2006 and has not worked since that time.  (R. 223).

## A.    Medical History

### 1.    2009

The first available medical record is from January 22, 2009, when Plaintiff went to the emergency department at Provident Hospital of Cook County ("Provident") complaining of chest pain and shortness of breath occurring intermittently for the previous three weeks.  (R. 363, 376).  Plaintiff stated that she experienced this "substantial chest pain" (level 9/10 and radiating to her left shoulder) upon walking short distances, but got relief with rest.  (R. 376). Though Plaintiff did not report any pain while at the hospital, she was admitted for further testing.  (R. 363).  A chest x-ray showed no active cardiopulmonary pathology, (R. 396), and she was discharged the next day with a diagnosis of stable angina, hypertension, diabetes, chronic obstructive pulmonary disease ("COPD"), and arthritis in the lower back.  (R. 375).

On May 4, 2009, Plaintiff saw Masie Isabell, M.D., of the Cook County Englewood Health Center (the "Englewood Center"), for low back pain and left thumb pain lasting 3 days.  (R. 324).  The treatment notes are difficult to read but it appears that Dr. Isabell recommended a stress test.  (*Id.*).  Plaintiff next saw Dr. Isabell for a routine check-up on August 20, 2009.  She denied having any pain at that time but apparently asked the doctor about fibromyalgia.  (R. 323 ("Pt.  ??  Fibromyalgia.").   Dr. Isabell diagnosed arthralgia, diabetes, and

hypertension, and noted that Plaintiff had "trigger finger pain."[2]  (*Id.*)  A few months later, on August 21, 2009, Plaintiff had x-rays of her hips and pelvis.  The tests were normal, with no evidence of fractures, dislocations or significant degenerative changes.  (R. 361).

Plaintiff returned to Dr. Isabell on October 14, 2009 complaining of heart palpitations caused by her medications (Enalapril and Celebrex).  Dr. Isabell adjusted the medications at that time.  (R. 322).  Shortly thereafter, on December 9, 2009, Dr. Isabell gave Plaintiff a steroid injection for "left thumb trigger finger." (R. 321, 350).  Later that month, on December 20, 2009, Plaintiff applied for disability benefits.

### 2.      2010

On March 5, 2010, M. S. Patil, M.D., completed an Internal Consultative Examination of Plaintiff for the Bureau of Disability Determination Services ("DDS").  (R. 334-37).  Plaintiff told Dr. Patil that when she walks more than half a block, she experiences shortness of breath (dyspnea) and sharp, non-radiating chest pain lasting 5 to 10 minutes.   (R. 334).   The pain is relieved with nitroglycerine, and has never resulted in hospitalization.  Plaintiff denied having shortness of breath while at rest, and said that her asthma was "under control" with inhalers.  She did not provide any "details regarding precipitating factors, frequency or duration of asthma attacks," and similarly had no complaints relating

---

[2]       "In trigger finger, . . . one of your fingers or thumb gets stuck in a bent position and then straightens with a snap – like a trigger being pulled and released.  If trigger finger is severe, your finger may become locked in a bent position." (http://www.mayoclinic.com/health/trigger-finger/DS00155, last viewed on May 29, 2013).

to her diabetes "at the present time." (*Id.*). Plaintiff did complain, however, of "constant, moderate pain in her back radiating down the left leg," as well as "sore spots throughout the body" she claimed to know was fibromyalgia. (*Id.*). She told Dr. Patil that the back pain bothers her when she does chores around the house, stands or walks for more than five minutes, or climbs a flight of stairs. (*Id.*). She also described "moderate stiffness" in her back and hips when she gets out of bed in the morning. (R. 334-35). Plaintiff stated that she "ha[s] arthritis . . . and sciatica," and that her pain medication and muscle relaxers, "do not help." (R. 335).

On physical examination, Dr. Patil described Plaintiff's breath sounds as normal bilaterally, with no wheezing or basilar rales. (*Id.*). He observed that she is "extremely obese" and has some reduced range of motion in her lumbar spine (20/25 on extension and lateral bending; 50/60 on flexion; and 50/90 on flexion). (R. 336). He also found "[f]ull range of motion of all joints" except for 30/40 on hip abduction, 30/40 on hip internal rotation, 40/50 on hip external rotation, and 140/150 on knee flexion. (*Id.*). Plaintiff's motor strength was 5/5 in her upper and lower extremities, her fine and gross manipulative movements of the hands and fingers were within normal limits, and she could "oppose thumbs and make good grips." (*Id.*). She had some difficulty getting on and off the exam table and doing squats and arises, but her gait was normal, she was able to walk 50 feet without any assistive devices, and she had no problem tandem walking, walking on heels and toes, or getting up from a chair. (*Id.*).

Dr. Patil diagnosed Plaintiff with chronic primary hypertension, atypical chest pain, diabetes mellitus, chronic bronchial asthma, extreme obesity, and history of arthritis, fibromyalgia and sciatica. (R. 337). There was no evidence of neurovascular deficits, pedal edema, anemia, chronic foot ulcers, congestive heart failure, stroke, pulmonary thromboendarterectomy, or deep vein thrombosis, and Plaintiff's blood pressure was normal. In addition, her lungs were clear with no cyanosis or acute airway compromise, and her two bronchodilators "help her considerably." (*Id.*). Dr. Patil observed that there was no deformity, redness, swelling or tenderness of any joint, and peripheral pulses and sensation were normal bilaterally. Plaintiff's gait, speech, hand dexterity and mentation were normal as well. (*Id.*). Dr. Patil confirmed that the August 2009 x-ray of Plaintiff's left hip was negative, and took a new x-ray of her lumbosacral spine. Though it was difficult to obtain a complete picture due to Plaintiff's size, the test did show what appeared to be "a transitional vertebra at lumbosacral junction," and "[t]he disc space immediately superior to this was narrowed." (*Id.*). There was also "sclerosis about the articular facets," and "suggestion of moderate spondylosis at the L5-S1 level," but no evidence of compression fracture deformity. (R. 337, 338).

Three days later, on March 8, 2010, Plaintiff returned to her treating physician, Dr. Isabell, complaining of hip, shoulder and back pain at a level of 10/10 despite taking tramadol and amitriptyline. (R. 348). The diagnoses included hypertension, fibromyalgia, and sciatica, and Dr. Isabell encouraged Plaintiff to "move." (*Id.*). The next day, on March 9, 2010, Charles Kenney, M.D.,

completed a Physical Residual Functional Capacity Assessment of Plaintiff for DDS. (R. 325-32). Dr. Kenney found that Plaintiff can: occasionally lift 20 pounds; frequently lift 10 pounds; stand, walk and sit for about 6 hours in an 8-hour workday; and push/pull without limitation. (R. 326). Dr. Kenney found no other postural, manipulative, visual, communicative or environmental limitations, and confirmed that the RFC was consistent with the medical opinions of record. (R. 327-29, 332).

When Plaintiff saw Dr. Isabell again on May 6, 2010, she said that her shoulder, hip and back pain had been at a constant level 10/10 since March. She also complained of twitching in her fingers and toes on the left side. (R. 347). Her pain medications included tramadol, Robaxin, gabapentin and ibuprofen. (*Id.*). At a June 17, 2010 visit, Plaintiff continued to complain of chronic back pain at a level 6/10. She also said that her left leg was "giving way," so Dr. Isabell prescribed an Ace bandage wrap. (R. 346, 402). A couple months later, on September 3, 2010, Plaintiff started seeing Titilayo Abiona, M.D., at the Englewood Center and reported sharp back pain radiating to her left leg at a level 10/10, as well as dizziness and pain in her buttocks. Dr. Abiona added radiculopathy and vertigo to Plaintiff's diagnoses, increased her dosage of amitriptyline, and recommended that she have an x-ray and CT scan of her lumbar spine. (R. 400-01).

Throughout November 2010, Plaintiff saw Dr. Isabell and Dr. Abiona three more times for fibromyalgia, pain in the lower back, leg and shoulder, and "pain all over" ranging from a level 6 to 9/10. (R. 398-99, 404, 405). She also

mentioned chest pain upon walking and was advised to take nitroglycerine as needed. (R. 398-99). Plaintiff was assessed as stable as of November 19, 2010, (R. 404), and Dr. Isabell ordered some x-rays and MRIs to rule out sciatica. (R. 405).

### 3. 2011

Plaintiff had an MRI of the lumbar spine on February 1, 2011. The test showed "[d]esiccation [dryness] of the intervertebral disc at L4/S1 associated with mixed Modic types I and II and III degenerative changes involving the vertebral endplates."[3] (R. 409). The test also revealed "[m]ild degenerative changes involving bilateral facet joints at the levels of L1/L2 through L5/S1," and "L5/S1 circumferential disc bulge effacing ventral epidural and narrows bilateral inferior neuroforamina." (*Id.*). The overall impression was "L5/S1 degenerative disc disease," (*id.*), and "[m]ild multilevel degenerative facet arthropathy." (R. 410).

The following month, on March 4, 2011, Plaintiff went to Provident complaining that her low back hurt and she had run out of pain medication. She reported getting temporary relief from Tylenol #3, but an NSAID (non-steroidal anti-inflammatory drug) and tramadol were of no help. (R. 417). Plaintiff was diagnosed with degenerative joint disease/osteoarthrosis, and prescribed Tylenol #3. (R. 419). The last medical records are from April 8, 2011, when Plaintiff had

---

[3]     "Modic changes (MC) are a common phenomenon on magnetic resonance imaging (MRI) in spinal degenerative diseases and strongly linked with low back pain (LBP)." (http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2556462/, last viewed on May 29, 2013).

a nuclear medicine cardiac perfusion scan and a stress test, both because of her chest pain. The perfusion scan was normal with no evidence of reversible or irreversible ischemia, (R. 427), and the stress test was similarly negative for ischemia.[4] (R. 429).

## B.    Plaintiff's Testimony

On January 28, 2010, Plaintiff completed a Function Report and Physical Impairments Questionnaire in connection with her application for disability benefits. (R. 245-55). She stated that she spends most of the day in bed, and that pain keeps her from sleeping "most of the time." (R. 245, 246). She has trouble standing and bending, which prevents her from doing yard work or mopping, and she only goes outside once or twice a month to buy groceries. (R. 248). Plaintiff indicated that as a result of back, shoulder and knee pain, she has trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentrating, understanding, and getting along with others. (R. 250). She also reported difficulties opening bottles and carrying grocery or laundry bags. (R. 254). Plaintiff estimated that she can only lift about 10 pounds, walk less than half a block before needing to stop and rest, and sit for 20 minutes at a time. (R. 250, 255).

Despite these limitations, Plaintiff acknowledged that she is able to cook "complete meals" for breakfast and dinner and wash dishes, though she may

---

[4]     "Myocardial ischemia occurs when blood flow to your heart muscle is decreased by a partial or complete blockage of your heart's arteries . . . . The decrease in blood flow reduces your heart's oxygen supply." (http://www.mayoclinic.com/health/myocardial-ischemia/DS01179, last viewed on May 29, 2013).

need to rest four or five times during these tasks.  (R. 247, 255).  She identified no difficulties using kitchen tools or performing other light cleaning jobs, such as ironing and changing the bed, and she bakes a lot, reads every day, uses the computer, watches television, talks on the phone, and has no problem with personal care.  (R. 245-47, 249, 254).

In a second Function Report dated July 15, 2010, Plaintiff stated that she cannot stand or walk without back, thigh and leg pain, and sometimes when she walks her left leg "gives out."  (R. 282).  She reported doing lower back exercises twice a day, sitting outside, and taking a walk "if somebody is with me [because] I might fall."  (R. 283).  Plaintiff indicated that she needs help putting on socks, tying her shoes and washing her hair, and she cannot do any lifting, bending, standing, sitting, kneeling or stair climbing due to severe hip, leg, back and buttock pain.  (R. 283, 287).  She also complained of "involuntary twitching" on the left side of her body.  (R. 289).  In addition to the activities mentioned in the first Function Report, Plaintiff also does puzzles, listens to music, plays games, and visits with people at the house.  (R. 286).

At the March 2, 2011 hearing before the ALJ, Plaintiff testified that her main complaints are sciatica and diabetes, along with chest pain.  (R. 30).  She has pain in her lower back, across the buttock and down her thighs to her knees, and it sometimes becomes a shooting pain even without a specific trigger.  (R. 34-35).  At the time of the hearing, Plaintiff was taking Tylenol #3 but "not getting any results," and she stated that while none of her medications cause any side effects, the pain is there "24/7."  (R. 32-33).  Plaintiff claimed that she had tried

physical therapy but it only helped for two days, and she never received any cortisone shots in her back.  Instead, Plaintiff takes hot showers and does some stretching.  (R. 32).

On a typical day, Plaintiff makes meals for herself, reads, lays down and stretches.  (R. 33, 34).  She cannot walk more than half a block, and if she has to do her own shopping, she "lean[s] on the cart as I walk."  (R. 33, 36).  Her son does the laundry and she is unable to vacuum or mop, though she can sit at the counter and do dishes.  (R. 34).  Plaintiff claimed that Dr. Isabell told her she is not allowed to lift or carry more than five pounds, and testified that she can sit on a cushion for 15 or 20 minutes before needing to stand, and stand while leaning against something for 10 or 15 minutes before needing to sit.  (R. 35, 39).  When her trigger thumb is inflamed, she cannot use her left hand at all.  An injection helped, but it started hurting again about two months before the hearing.  (R. 36).  Plaintiff said that she cannot comb her hair due to shoulder pain, and she experiences twitching in the fingers and toes on her left side that comes and goes three or four days a week.  (R. 37-38).  On two occasions, her left leg gave out and the doctor gave her an Ace bandage.  (R. 38).  She started experiencing vertigo in September 2010 but "[i]t's not bad" and only occurs about twice a day. (R. 40).  Plaintiff finally testified that she uses her asthma inhaler four times a day and last went to the hospital for treatment about a year before the hearing.  (R. 34).

## C.     Vocational Expert's Testimony

Ms. Kehr testified at the hearing as a VE.  She stated that Plaintiff's past work as a phlebotomist was semi-skilled and light per the Dictionary of Occupational Titles ("DOT"), but heavy as Plaintiff performed it.  (R. 41).  The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education and past work experience who can: occasionally lift/carry 20 pounds: frequently lift/carry 10 pounds; and sit, stand and walk for at least 6 hours in an 8-hour workday; but cannot have concentrated exposure to dust, fumes and gases.  (R. 42).    The VE testified that such a person would be capable of Plaintiff's phlebotomist job, both as she performed it and as described in the DOT.  (R. 43).  She could also work as an office helper (approximately 4,300 jobs available), information clerk (approximately 4,700 jobs available), or mailroom clerk (approximately 6,000 jobs available).  (*Id.*).  These same jobs would be available to a person who can only occasionally climb, crouch, crawl and kneel.  (R. 43-44).  The person could not work as a phlebotomist, however, if she were limited to only occasional reaching, or to occasional fingering or grasping with the left hand.  (R. 44).

## D.     Administrative Law Judge's Decision

The ALJ found that Plaintiff's diabetes, hypertension, degenerative disc disease in the lumbar spine, high cholesterol, asthma, COPD, stable angina and obesity are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 15-16).  Plaintiff's fibromyalgia, sciatica, left thumb inflammation and history of arthritis

are "non-severe impairments that "do not result in more than minimal limitations in [Plaintiff's] ability to perform work related activities." (R. 15). After reviewing the medical records, the ALJ determined that Plaintiff has the capacity to perform light work with no concentrated exposure to dust, fumes and gases. (R. 16).

In reaching this conclusion, the ALJ gave great weight to Dr. Kenney's RFC assessment, which she found "consistent with the record as a whole." (R. 19). The ALJ described Plaintiff's treatment for degenerative disc disease, high cholesterol, stable angina, asthma, and COPD as "routine and conservative," and noted that her diabetes and hypertension are controlled with medications. (R. 17, 18). Though the ALJ discussed Plaintiff's complaints of disabling pain in detail, she found them to be inconsistent with the objective medical evidence. For example, Dr. Patil found no neurological or spinal deformities, cardiac and chest exams were normal, and the 2011 MRI showed only mild degenerative facet arthropathy. (*Id.*).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing her past work as a phlebotomist, (R. 19), as well as a significant number of light jobs available in the national economy, including office helper (4,300 jobs available), information clerk (4,700 jobs available), or mailroom clerk (6,000 jobs available). (R. 20 n.2). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## DISCUSSION

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[5]   A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).   In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?   *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.    Analysis**

Plaintiff claims that the ALJ's decision must be reversed because she:  (1) made a flawed credibility assessment; (2) improperly ignored the effects of her non-severe impairments in determining her residual functional capacity ("RFC"); (3) erred in failing to order a pulmonary function test; and (4) violated her

---

[5]      The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*, and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq.*

constitutional Due Process and Equal Protection rights by failing to obtain a medical source statement from the consultative examiner.

### 1.    Credibility Assessment

Plaintiff first objects to the ALJ's decision to discount her testimony. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

As a preliminary matter, the Court notes that the ALJ included the following language in her credibility analysis: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are inconsistent with the [stated] residual functional capacity assessment." (R. 19). The Seventh Circuit has repeatedly criticized this

template as "unhelpful" and "meaningless boilerplate," but ALJs continue to use it in their decisions. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Each time they do so, plaintiffs and their counsel seize on the language as evidence that the credibility finding is backwards and defective. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.").

The Court agrees that the "hackneyed language seen universally in ALJ decisions adds nothing" to a credibility analysis. *Shauger*, 675 F.3d at 696. Where, as here, however, the ALJ provides a detailed discussion of the plaintiff's symptoms and testimony, and the reasons she did not find the plaintiff's statements fully credible, the use of the boilerplate template does not alone provide a basis for remand. *See, e.g., Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) ("If the ALJ has otherwise explained his conclusion adequately, the inclusion of this [boilerplate] language can be harmless."); *Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) (the boilerplate language is "inadequate, by itself, to support a credibility finding," but decision affirmed where "the ALJ said more."). Plaintiff's argument to that effect is rejected.

Turning to the ALJ's substantive analysis, she first concluded that Plaintiff's complaints of disabling limitations "are not supported by the medical records." (R. 18). Plaintiff testified that she needs to lie down most of the day, cannot sit or stand for more than very short periods of time, and has difficulty lifting objects due to severe shoulder pain. She also uses an inhaler four times a

day and said she is unable to do laundry or cleaning.  (R. 17, 18).  As the ALJ noted, however, Plaintiff's course of treatment has been routine and conservative, with no indication that she has such severe restrictions.   For example, Plaintiff's diabetes, hypertension and high cholesterol are all controlled with medications.  Her blood pressure and vitals were stable at the March 2010 consultative exam, and she reported just one instance of dizziness and vertigo in September 2010.  (R. 17, 337, 401).  Plaintiff testified that the vertigo causes her to stagger a couple of times a day, but she said that it "do[es]n't happen often" and conceded that "[i]t's not bad."  (R. 17, 40).

Plaintiff was hospitalized in January 2009 for stable angina, asthma and COPD, but as the ALJ noted, she was not in acute distress and her pain was relieved with rest.    (R. 17-18, 376).    A chest x-ray showed no active cardiopulmonary pathology, (R. 375), and when Plaintiff saw Dr. Patil in March 2010, her lungs were clear with no cyanosis or acute airway compromise, and her asthma was controlled with inhalers.  (R. 18, 337).  Plaintiff last complained of chest pain in November 2010 and was advised simply to take nitroglycerine as needed.  (R. 18, 399).  Moreover, her April 2011 perfusion scan and stress test were both normal with no evidence of ischemia.  (R. 427, 429).  Given this record, the ALJ reasonably characterized Plaintiff's overall treatment for stable angina as "routine and conservative."  (R. 18).

With respect to Plaintiff's degenerative disc disease, the ALJ noted that she consistently complained of severe back pain, but that Dr. Patil found no deformity, redness, swelling or tenderness of any joint in March 2010.  (R. 17,

337).  Though Plaintiff had some difficulty doing squats and arises, she had a normal gait, normal sensation bilaterally, and no problem tandem walking, walking on heels and toes, or getting up from a chair.  (*Id.*).  Based on this report, Dr. Kenney found Plaintiff capable of occasionally lifting 20 pounds; frequently lifting 10 pounds; and sitting, walking and standing for 6 hours in an 8-hour workday.  (R. 19, 326).  A subsequent MRI in February 2011 did show disc bulge and bilateral narrowing of the inferior neuroforamina at L5/S1, and dryness at L4/S1, but the overall impression was only mild multilevel degenerative facet arthropathy and degenerative disc disease at L5/S1.  (R. 17, 410).  Significantly, Plaintiff testified that she has never had any cortisone shots in her back, the doctors never suggested surgery, and aside from medication, she merely takes hot showers and does some stretching to relieve her pain.  (R. 32).

Plaintiff objects that the ALJ's analysis of her back condition is fatally flawed due to the following error:  at step two of the analysis, the ALJ incorrectly stated that a March 2010 x-ray of her lumbosacral spine was "normal and she had full range of motion in all joints."  (R. 15).  The x-ray actually showed what appeared to be "a transitional vertebra at lumbosacral junction."  (R. 337).  In addition, "[t]he disc space immediately superior to this was narrowed[,] [t]here was sclerosis about the articular facets," (*Id.*), and there was "suggestion of moderate spondylosis at the L5-S1 level."  (R. 338).  Dr. Patil further reported some reduced range of motion in Plaintiff's lumbar spine and joints.  (R. 336).  Plaintiff insists that "[m]ischaracterization of the record evidence of this sort requires reversal and remand."  (Doc. 16, at 7).

Defendant concedes that the ALJ made the stated error but claims that it was harmless. (Doc. 24, at 4-5). *See Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. July 30, 2010) (internal quotations omitted) ("Harmless errors are those that do not affect an ALJ's determination that a claimant is not entitled to benefits."); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("The doctrine of harmless error indeed is applicable to judicial review of administrative decisions."). The Court agrees. Though Plaintiff's range of motion was not "full" in March 2010 as stated by the ALJ, neither was it as severely restricted as suggested by Plaintiff. According to Dr. Patil, Plaintiff scored 20/25 on extension and lateral bending; 50/60 on flexion; 50/90 on flexion; 30/40 on hip abduction; 30/40 on hip internal rotation; 40/50 on hip external rotation; and 140/150 on knee flexion. (R. 336).

Moreover, the ALJ accurately described the remainder of Dr. Patil's report, which showed good functioning despite the x-ray abnormalities and limitations in range of motion. As noted, Dr. Patil found that Plaintiff: exhibited a normal gait; walked without any assistive devices; had no difficulty tandem walking or walking on heels and toes; had no deformity, redness, swelling or tenderness of any joint; and exhibited normal peripheral pulses and sensation bilaterally. (R. 17, 336-37). Dr. Kenney, who specifically acknowledged and considered Plaintiff's range of motion limitations as set forth by Dr. Patil, concluded that she has the residual functional capacity to perform light work. (R. 332). The ALJ relied heavily on

that assessment, which is not contradicted by any other medical report.[6] (R. 19, 326). *See Compean v. Astrue*, No. 09 C 5835, 2011 WL 1158191, at *8 (N.D. Ill. Mar. 28, 2011) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)) (the ALJ "was entitled to rely upon the opinion of the state agency physician, particularly where no physician imposed any greater functional limitations than those found by the ALJ in her RFC determination."). The ALJ also discussed and considered the results of the February 2011 MRI. Notably, Plaintiff has not identified any physician who suggested that her functional limitations are anywhere near as severe as she alleges.

In an effort to avoid these shortcomings, Plaintiff makes much of the fact that the ALJ said nothing about Dr. Patil's observation that she had difficulty getting on and off the exam table. (Doc. 16, at 6; Doc. 25, at 3). Regardless, the ALJ did note the doctor's observation that Plaintiff had difficulty squatting and arising, (R. 17), and clearly considered relevant record evidence that both helped and hurt Plaintiff's case. The Seventh Circuit has long held that an ALJ "need not provide a complete written evaluation of every piece of testimony and evidence" as long as she builds a logical bridge from the evidence to her conclusion. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (internal quotations omitted). On the facts presented, any error the ALJ made in addressing Plaintiff's range of motion and x-ray results was harmless, and her

---

[6]     Plaintiff testified that Dr. Isabell limited her to carrying 5 pounds, (R. 35, 39), but the medical records do not support such a restriction.

decision to discount Plaintiff's complaints of disabling joint pain was not patently wrong.

Plaintiff argues that the case must still be remanded because the ALJ made a second factual error, this time relating to her thumb. Specifically, the ALJ wrongly stated at step two of the analysis that Plaintiff "testified at the hearing that she currently does not have any difficulties with her left thumb." (R. 15). In fact, Plaintiff stated that her trigger thumb had started hurting again about two months before the hearing, and that when it is inflamed she cannot use her left hand at all. (R. 36). She also complained that she experiences twitching in the fingers in her left hand that comes and goes three or four days a week. (R. 38). Plaintiff claims that this "was a serious error in light of the VE's testimony that Plaintiff would have been incapable of her past work and would have gridded had she been limited to occasional reaching, grasping or fingering with her left hand." (Doc. 16, at 1; Doc. 25, at 3).

Defendant once again concedes the error but insists that it, too, was harmless. *Scott*, 730 F. Supp. 2d at 935; *Spiva*, 628 F.3d at 353. Though the ALJ misstated Plaintiff's March 2011 testimony that her thumb was hurting again, she correctly observed that Plaintiff had not complained to her physicians about thumb pain, or received any treatment for it, since the December 2009 steroid injection. (R. 15). The ALJ also cited repeatedly to Dr. Patil's March 2010 report, which stated that Plaintiff's strength was 5/5 in all extremities, her fine and gross manipulative movements of the hands and fingers were within normal limits, and she could "oppose thumbs and make good grips." (R. 17-18, 335). In addition,

the ALJ gave great weight to Dr. Kenney's RFC assessment, which included no manipulative limitations. (R. 19, 328). Plaintiff does not point to any other medical evidence suggesting that she has greater limitations in her left hand. On this record, the Court agrees with Defendant that the ALJ's error in describing Plaintiff's thumb condition was harmless, and the decision to discount her complaints of disabling hand limitations was not patently wrong.

Trying a different approach, Plaintiff objects that the ALJ improperly penalized her for failing to pursue additional testing and treatment for her conditions. (Doc. 16, at 6; Doc. 25, at 2-3). In Plaintiff's view, the ALJ should not have "made her own determination about the prognosis of recovery should Plaintiff get more treatment, when the record was devoid of any evidence that she could return to work if she obtained it." (Doc. 16, at 6) (citing *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985)) ("It was . . . improper for the ALJ to make his own determination regarding the prognosis of recovery should [the claimant] stop smoking, when the record was devoid of any evidence that she could return to work if she quit smoking."). This argument is unavailing because it mischaracterizes the ALJ's findings in this case. Unlike in *Rousey*, the ALJ never suggested that Plaintiff's conditions would have improved with additional or different treatment. Rather, she found that the routine and conservative nature of the treatment described in the record "suggests greater functional ability" than Plaintiff alleged, casting doubt on her credibility. (R. 17-19). "The fact that a claimant has received only conservative treatment is a ground for finding that [her] allegations concerning pain and other limiting factors are not entirely

credible." *Butler v. Astrue*, No. 10 C 6098, 2011 WL 6207089, at *5 (N.D. Ill. Dec. 13, 2011) (citing *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005)). Plaintiff does not claim that her treatment was anything other than conservative, and the ALJ did not err in discounting her credibility on this basis.

In sum, the ALJ reasonably concluded that Plaintiff's testimony was not supported by the medical evidence and was undermined by the conservative nature of her treatment history. Any errors the ALJ made in describing Plaintiff's joint and thumb problems were harmless. The Court is satisfied that the ALJ's credibility assessment is not patently wrong and is not grounds for reversal in this case.

### 2. RFC Determination

In a somewhat related argument, Plaintiff claims that the case must be remanded due to the ALJ's improper RFC determination. She once again objects to the ALJ's use of the boilerplate credibility language, claiming that her "credibility was ignored in determining her residual functional capacity in violation of SSR 96-7p." (Doc. 16, at 7-8) (citing *Bjornson*, 671 F.3d at 645-46). As set forth in the previous section, the ALJ clearly considered Plaintiff's credibility in determining her RFC, and the case will not be remanded merely because the ALJ included the hackneyed boilerplate language in her decision.

Plaintiff also claims that the ALJ "improperly failed, while assessing [her] RFC, to consider in combination the impairments ruled singly non-severe," including "fibromyalgia, sciatica, left thumb inflammation, and history of arthritis." (Doc. 16, at 8). She then reiterates the ALJ's factual errors regarding her x-ray

results and thumb pain. (*Id.* at 8-9). It is true that an ALJ's "failure to fully consider the impact of non-severe impairments requires reversal." *Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) (quoting *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010)). Here, the ALJ arguably failed to consider Plaintiff's thumb pain by misstating her testimony about it. As noted, however, that error was harmless in light of the fact that Plaintiff had not complained about, or received treatment for, her thumb since December 2009, leaving uncontroverted Dr. Patil's March 2010 report that she had full strength, normal fine and gross manipulative movements, and full ability to "oppose thumbs and make good grips." (R. 17-18, 335).

Turning to the other impairments, the ALJ expressly mentioned Plaintiff's sciatic nerve pain at step three of the analysis but found it significant that she had received only "minimal treatment." (R. 18). Plaintiff does not dispute this conclusion, or point to any contrary evidence. Nor does she claim that her sciatica, fibromyalgia and history of arthritis produce symptoms different than those relating to her spinal problems, which the ALJ discussed in detail in determining Plaintiff's RFC. It is worth noting again that the RFC is consistent with Dr. Kenney's findings, and Plaintiff has not identified any physician who imposed greater limitations. *See Compean*, 2011 WL 1158191, at *8. Plaintiff's request for remand based on the RFC determination is denied.

### 3. Pulmonary Function Test

Plaintiff next objects that the ALJ should have ordered a pulmonary function test given that she has stable angina and needs to use an inhaler four

times a day. (Doc. 16, at 9-10). She directs the Court to 20 C.F.R. § 416.919a(b), which states that an ALJ may order a consultative examination "to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on [a] claim." Of course, an ALJ "is not *required* to order [consultative] examinations," *Skinner*, 478 F.3d at 844 (emphasis in original), and "the claimant is responsible for providing medical evidence of h[er] disability." *Caine v. Astrue*, No. 08 C 50103, 2010 WL 4627718, at *13 (N.D. Ill. Nov. 3, 2010) (citing *Howell v. Sullivan*, 950 F.2d 343, 349 (7th Cir. 1991)).

As noted, Plaintiff was diagnosed with stable angina and COPD in January 2009 when she went to the hospital complaining of chest pain and shortness of breath. (R. 375-76). A chest x-ray taken at that time showed no active cardiopulmonary pathology, (R. 396), and in March 2010, Dr. Patil found that Plaintiff's breath sounds were normal bilaterally, with no wheezing or basilar rales, (R. 335), and that her lungs were clear with no cyanosis or acute airway compromise. (R. 337). Dr. Patil described Plaintiff's asthma as "under control" with inhalers, noting that she did not provide any "details regarding precipitating factors, frequency or duration of asthma attacks." (R. 334). The first time Plaintiff mentioned chest pain to her treating physicians was in November 2010, at which time Dr. Abiona instructed her to take nitroglycerine as needed, and advised her to go to the ER if it became a problem. (R. 399). Notably, there is no evidence that Plaintiff ever sought emergency treatment for her angina or asthma after January 2009, and none of her doctors found it necessary to order

any pulmonary function tests. Moreover, Plaintiff's April 2011 nuclear medicine cardiac perfusion scan and stress test were both negative for ischemia. (R. 427, 429). On this record, there is no basis for Plaintiff's unsupported belief that a pulmonary function test "would have tended to limit her to sedentary work." (Doc. 16, at 10; Doc. 25, at 5).

The Seventh Circuit has recognized that "one may always obtain another medical examination, seek the views of one more consultant, wait six months to see whether the claimant's condition changes, and so on." *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994) (quoting *Kendrick v. Shalala*, 998 F.2d 455, 456-57 (7th Cir. 1993)). "But the need for additional tests or examinations will normally involve a question of judgment, and we generally defer to the ALJ's determination whether the record before her has been adequately developed." *Wilcox v. Astrue*, 492 Fed. Appx. 674, 678 (7th Cir. 2012) (citing *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009)). The ALJ reasonably concluded that she had sufficient information to determine whether Plaintiff's asthma and stable angina cause disabling limitations, and her failure to order a pulmonary function test does not constitute reversible error.

### 4. Constitutional Arguments

Plaintiff finally claims that the ALJ violated her constitutional rights of Due Process and Equal Protection by failing to obtain a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" ("MSS") from Dr. Patil, and instead relying on the RFC provided by Dr. Kenney. (Doc. 16, at 10). Plaintiff describes this as an "impermissible tactic used by Illinois – obtain from the

consultative examiner only raw observations and not the required opinion as to restrictions, leaving non-treating, non-examining state agency sources at liberty to make up an RFC assessment that will defeat the claim." (*Id.* at 12). Plaintiff maintains that claimants "fare better" in Arizona and Tennessee, where the consultative examiner is also the physician supplying the RFC. (*Id.*). This discrepancy between states, Plaintiff says, constitutes a violation of Due Process and Equal Protection. (*Id.* at 13-14).

The problem with Plaintiff's argument is that the Seventh Circuit summarily rejected it in *Dornseif v. Astrue*, 499 Fed. Appx. 598 (7th Cir. 2013). Specifically, the court concluded that the fact that ALJs in Illinois, "unlike their counterparts in Tennessee and Arizona, do not routinely require prehearing consultative reports to be supplemented with [an MSS] . . . fall[s] short of showing that the Commissioner's practice is unlawfully discriminatory." *Id.* at 601. *See also Dragisic v. Astrue*, No. 11 C 999, 2012 WL 893728, at *11 n.9 (N.D. Ill. Mar. 15, 2012) ("We . . . fail to see how the fact that one Arizona claimant benefitted from a medical source statement (or that a Tennessee ALJ has purportedly stated that claimants there benefit from similar statements) rises to the level of an equal protection/due process violation.").

Plaintiff argues that *Dornseif* is not controlling because the plaintiff in that case did not request an MSS until after the administrative hearing, whereas she raised the issue before the hearing. (Doc. 25, at 5-6). The district court in *Dornseif* did note that the plaintiff there "never presented [the Arizona] reports to the ALJ for review." *Dornseif v. Astrue*, No. 11 C 4335, 2012 WL 1441770, at

*10 (N.D. Ill. Apr. 26, 2012). But there is no indication that the Seventh Circuit based its ruling on the timing of the request for an MSS. Moreover, Plaintiff ignores the *Dornseif* district court's further observation that under 20 C.F.R. § 416.919n(c)(6), "the lack of a[n] MSS does not necessarily render a consultative examination incomplete," so "the absence of a[n] MSS, alone, cannot form the basis for a[n] equal protection or due process claim." *Id.* Plaintiff's request for remand based on the ALJ's allegedly discriminatory failure to order an MSS from Dr. Patil is denied.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 13) is denied. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: June 7, 2013

SHEILA FINNEGAN
United States Magistrate Judge